Good morning, Your Honors. May it please the Court, Brianna Fuller-Mierczak on behalf of Mr. Lucas. Mr. Lucas was charged and sentenced in two separate cases, a fraud case and a marijuana case. Both need to be remanded to their respective district courts for different reasons. In the fraud case, lack of attention to the disparity of the sentence was imposed, and the specific role Mr. Lucas played in the offense led to a sentence that was both procedurally and substantively unreasonable. In the marijuana case, on the other hand, the Court modified Mr. Lucas' sentence long after it had jurisdiction to do so and outside of the bounds of Rule 35, 36, or the rule of mandate. For these reasons, we argue that both cases should be remanded. Can I just ask something about the marijuana case? What is the practical result if we reverse the modification of the marijuana case? We've asked for a vacatur of the amended judgment and commitment. That would mean the original judgment and commitment would stand, and the Bureau of Prisons would do with it what it does. And so how many months less incarceration will that result in? The BOP originally said that the sentence would be absorbed into the fraud case, which means it would be entirely wiped off or concurrent. Because of the prior days he had served? Exactly. That's my understanding. At a different point, I believe they said 47 days, so it may have a slightly consecutive sentence. We, you know, we can see that that was not the intent that Judge Feist had, that that was the practical effect of what he said. And I think that's an important place to start, because what we have here is an oral pronouncement of sentence that was 60 months to begin on January 1, 2016. We have a written judgment that matches that oral pronouncement exactly. It was a legally valid sentence, meaning it followed exactly the prescription that the sentencing guidelines have said in order to effectuate a consecutive sentence, and it was not ambiguous as to meaning. That is to say, the BOP didn't write to Judge Feist to say, we don't know how to carry out this sentence. It said this sentence will have the effect of being absorbed into the fraud sentence. If what you meant to do was this, you would have to change the judgment commitment to mean this. It's not an ambiguous judgment. It's one that had a meaning different to the one that the judge had in his preliminary statement said was what he intended. He didn't intend to have it operate the way the BOP says it was going to operate, right? His initial statement was he assumed that the effect of what he was going to say would be a slightly consecutive sentence, and that's not how the BOP did it, following the rules of how the credit is to be paid. Here's what I'm getting at. I understand Rule 36 only allows the judge to change a sentence for clerical or to correct a sentence for clerical errors. It doesn't permit a judge to have buyer's remorse. You know, he sends a guy on Monday, I should have given him X and I gave him Y. I've changed my mind. Rule 36 prohibits that. Here, everybody seems to agree the judge wasn't changing his mind about what he wanted to do. He just didn't write it down properly. I don't know why the law would not permit a judge to correct something like that. It might work to the defendant's benefit sometimes. It might work to the defendant's detriment. But you wouldn't want an error that you know is an error, a scrivener's error, sort of, to go and correct it. I don't know why the law would want to tolerate something like that. I think, I mean, I think the first point is it's more than just a scrivener's error. You know, the court in the Dickey case says the real question about Rule 36 is a factual finding about whether the clerk wrongly described the oral sentence that was imposed by the judge, right? So this is more than scrivener's error because this is something that was not merely the clerk taking down wrong. But more to your point, I think, I think that the Munoz de la Rosa case talks about the problems with distinguishing cases between buyer's remorse and what the judge intended. The problems, the problems in deciding whether, you know, I mean, it is a Suppose the judge made a mistake that resulted in this guy getting more time than he really intended because of the way it was written down. Why shouldn't Judge Fies be able to fix that? Why should your client have to suffer more time because of a mistake of that nature? And that is exactly what happened in the Werber case. This isn't a case that enters to the government's benefit or to the defendant's benefit. In Werber, which is a Second Circuit case, you know, the court said, I thought that he would get credit for this time. All of a sudden, he's not. I mean, the problem is it's hard to draw the line. And so for that reason, based on the very, very narrowness of Rule 36 and the important value of the finality of sentences, there's no room for judges to go back and modify their judgment to match what their intent was. That's what Munoz de la Rosa was. That's what Kay was. And certainly in Werber. Kagan. Yes. So a judge, if he misspeaks, is stuck with what he considers an unjust sentence. That is the effect. That's the way the statute is read. That's the way the statute is written. That's how it's been interpreted. I think Munoz de la Rosa, again, is a good example of that. I think everybody agreed that the judge meant to say consecutive, and he said concurrent. But the court said, you know, it's going to result. Well, there it turned out to be more lenient. There it turned out to be more lenient. Yes. But when it turns out to be harsher, what is the purpose when a judge thinks carefully about sentence and misspeaks? What is the purpose of a statute that says if he sentences to a much harsher term than he intends, he may not touch it? The purpose is simply in the finality of sentences. And the problems in going back later and trying to remember, well, did I mean that? What did I mean? Things like that. Well, when the judge knows what he meant, when it's brought to his attention the way it has turned out, he never had any doubt as to what he meant. I understand. As to the length that he intended. I understand. Is it just because it's the judge and not the clerk that makes the error of words that the statute precludes the judge from correcting a clear error? That is the line that this Court has drawn and that other courts have drawn. There are cases like Pena that say that. You have a case in which it made a great difference in the length of the sentence, not in favor of the defendant. I think the Werber case. I don't remember exactly how drastic that effect was. I would suggest, just putting on my defense lawyer hat, that if that were the case and it was clear what the intent was, there may well be an IAC claim against a defense lawyer for not, you know, making sure that that was correct. And not showing to the judge's attention his error. Yes. Immediately. Exactly. I think the statute used to be seven days for a clerical error. I believe that's correct. Yeah, because when I first sat, I made a mistake in a sentence, and I couldn't change it because it was after seven days. And I don't remember which way it went, but my very first sentencing, and I couldn't change it. But it was seven days too late. Well, you thought you were barred in any event. Well, right. I'm just saying that judges make mistakes. And sometimes they're allowed to change them, and sometimes they're not. It's true. And in all of these cases, it did result in a sort of windfall to one party or the other. That's the effect of having a narrow rule that favors the repose of the sentence instead of the ability to go back and reconsider or to ensure that the intent was effectuated in the words. If you'll allow me, I want to just touch briefly on the fraud case. I'll start with the intended loss multiplier. Within, you know, just as an initial point as far as that initial, the intended loss multiplier, this Court has said certainly that courts can use multipliers in sentencing. But in the Culp case, it said it's an area in which courts need to proceed with caution. And that reason for the caution is well-founded. Here we have a loss of approximately $301,000. That's the loss that was actually proved by the wire transfers. The government, through its use of two multipliers, claims a loss of over $1.5 million. In other words, the multipliers in this case have the effect of quintupling the loss. For that reason alone, caution is warranted. Here, the intended loss multiplier was the government's attempt to account for the money that was transferred into drop accounts but was not actually withdrawn by the co-defendants. Now, if the government had limited its request to cases in which it actually had the bank records showing what money was left in the accounts, that would have been one thing. The government didn't have those records, so instead it took a sample of about one-fifth of those accounts, which it called the certain drop accounts. Can I ask a question? So 53 people, there were 53 defendants indicted. I believe that's right. And did the government have records of all the transactions of all 53 people? I believe, and I'll leave this to Mr. Chang. My understanding is it had records that pertained to most of those defendants. What it didn't necessarily have was records for people who were not among that 53. So if you're a person, and I sentenced one of these people. I'm not sentenced. I heard the appeal from one of these people. If you're a person who opened the bank account, the drop account, bank account, and not all the money was transferred back out to, say, Lucas, so there was maybe $100,000 left there, what happens to that money? What happened to that money? And is that included in this intended loss multiplier or not? So if I understand your question right, the money that was taken out of the account was wired, right? And so the wire money, that is the $301,000. That's how they used to form their base number on which they added the multipliers. The money that was left in the account, as a practical matter, would go back to the bank, right? It was reaccounted for and sent back to the right account. The banks didn't have to pay that out. This multiplier was trying to capture what happened to that one account but multiply it across all the accounts they didn't have, if that makes sense. So they knew that there had been $1,000 put into there but only $800 taken out. That $200 was counted as intended loss. The ratio was used to extrapolate across the rest of the accounts. I'm now starting to eat into Ms. Sullivan's time. So I guess if there's specific questions, I'd be happy to follow up. I'm still trying to understand. Maybe the government can clarify it. Okay. I guess, Ms. Sullivan, you're up. May it please the Court, Holly Sullivan on behalf of Mr. Clark. Your Honor, if I can go through. The same calculations were applied to my client, both the actual loss and intended loss. I agree with counsel's assessment of how those numbers were worked out. My understanding is that the government did not have documentation for all the actual loss from the bank. So what they did is they had, I guess the scope of the scheme, was that they took the amount of the wire transfers back to the Egyptian co-conspirators, and they believed that was approximately 30 percent of the full amount that had been transferred, and that was based on Lucas's statement. So the first is a multiplication of 3.33. And no one disputes that. And that's to get the actual loss. No one disputes that. Okay. Then they took, so some transfers, $900 would be transferred, $900 would be brought out. Some transfers, $700 would be transferred, and $655 would be taken out. So that amount that was still left in, that was not fully withdrawn, the government determined through taking a mean, I guess, of going through all the different numbers, that that would be a 1.5-something multiplication. And so then they took that, so the initial loss amount times the first multiplier, 3.33, and then times the second, 1.5. Is it your contention that counts it twice? Yes. The reason why is that intended loss multiplier was already taken into account based on the original actual loss multiplier. So what the government's relying on is a statement from Lucas post-arrest that when you have a $1,000 order, that you cash out a $3,000. That means it was cashed out at $3,000. What isn't clear is whether that cashed-out amount is from the proceeds or from the actual full amount of the transfer, so what the person withdrew when they were in the United States or the full amount of the transfer. The problem with that, or the concerns with that, are that when the text messages or instant messages are going back and forth between the co-conspirators and the charged conspirators here, it doesn't make sense if it's based on the proceeds. All of these transactions are happening instantaneously with text messages and instant messages going back and forth. If they're negotiating the amount that they are to receive at a 30% amount, it doesn't make sense that it's based on what the actual person is able to take out of the transfer. It makes sense, and it's logical, that it's from the full amount that gets transferred. So $1,000 will be negotiated ahead of time at a 30% rate. So I'm going to transfer $1,000, and then you give me 30% of that back, wire 30% of that back to me after we receive it. Let me ask you this. You have just a minute and a half left or so. Would you say a word about the role enhancement? Yes, Your Honor. The supervisory. In the role enhancement, the district court made a determination that it was reasonable to find that Clark was responsible for more than what probation had suggested, that he clearly had his girlfriend involved and supervised her. But the evidence that the government submitted in support of that doesn't actually support that. The record is insufficient to support that enhancement. The record shows that at Lucas's direction that Clark corresponded with the Egyptian co-conspirators. That doesn't involve anything of control. It might suggest his culpability, but not his control over others. And then that there were transfers that were sent. Well, what do they say he did vis-a-vis the girlfriend? That he had at one point received a text message based on a drop to another person that was one of the people she had controlled. There's nothing showing anything was done with that message on Clark's part. The other thing is they said that there were transfers that were sent to the same co-conspirators as the girlfriend. And just that overlap of having the same co-conspirators receiving transfers also doesn't show that there's any type of supervision or control over the girlfriend. Well, was the girlfriend, was she working for Clark or was she like co-equal with Clark and other people? I would say co-equal with Clark and other people. She probably did not have as great a part as Clark, but she was also taking parts of the transfer. So she didn't have the same type of culpability that he did. But she had the same type of role in the offense. Thank you. Thank you, Ms. Sullivan. Mr. Chang. May it please the Court, Ronald Chang for the United States. In the sentencing of both defendants, the respective district judges considered a variety of material relating to the losses that were incurred in the case. Both judges sought to arrive at not just actual loss, but the intended loss figure. And to do that, the government had submitted interviews of Mr. Lucas after arrest, text messages, a summary of the bank statements that were available to the government, as well as other material that showed that That amount was $300,000. I need a little more explanation of this. Okay. So that money was sent to the Egyptian people because of their job in phishing the account numbers and providing them. Yes. The scheme could not have worked without the Egyptians having compromised Bank of America and Wells Fargo accounts and then transferring the money into the drop accounts. So the Egyptian phishers also transferred the money into the drop accounts. Correct. Okay. So they're getting one-third of the profits. That's our contention. Okay. Of the money that was actually pulled out. And so to account for that, that is the so-called actual loss multiplier of 3.33. And as Your Honor indicated, there is no real dispute as to that. And that's further supported from another aspect by Mr. Lucas's post-arrest statement, where he told the agents the money that was sent by Western Union was a drop in the ocean. And when the agents asked him, well, what does that mean, when you talk about several hundred thousand dollars, is that are we talking about 900,000, we're talking about several million, he again reiterated, that's just a drop in the ocean. And he described not only was that a portion of the money that was actually taken out, but he also admitted that he had ripped the Egyptians and never paid them their share to begin with. And this was something that's reflected in the IM messages, that Mr. Lucas and Mr. Clark were accused by the Egyptians of being rippers. So there's that additional overlay. To continue with the calculation, what we then contended was the money that was pulled out was not the entirety of the money that was transferred. There needed to be some way to capture the money that the Egyptians had transferred, but that the drops were unsuccessful in pulling out of the banks. We have certain instances where the drops got all the money out. We have instances where the drops got half of the money out. We have instances where the account went eighths. In other words, they didn't get any of the money out. The banks simply negated the account and then indicated all eighths on the balance. To capture all of those scenarios, what we did was we took the amounts that we could substantiate where the money was pulled out, where part of the money was pulled out, and where none of the money was pulled out. So is that your chart? That's the chart that's at Excerpt of Record 292. It's attached to your brief too, right? That's correct. Okay. So this represents ‑‑ I mean, how did you ‑‑ did you have a choice in which transactions you ‑‑ We started with the defendants who were in the case. And in our excerpt of record, we attached a table that showed all of the transactions in the overt acts of the indictment and the relevant defendant. And we tried to capture those defendants in this chart. A number of those defendants were so‑called crew leaders. And for those crew leaders, we compiled from the documentation available to us other drops who were not charged because they couldn't pull money out of the case. Our general thinking in charging the case was if you pulled out over a certain amount of money, then that was a defendant worth pursuing in a criminal charge. If somebody was unable to pull out money both because of proof problems as well as whether this was an appropriate defendant to charge, that person was left out of the indictment. But that doesn't negate the fact that there was still a transfer. And so we tried to capture that in the chart. So, for instance, for Antonio Colson, who was charged, there were drops who were also charged in the case, but there were others who were not because they couldn't withdraw money. For instance, at Excerpt 292, you have Farron Marceline. $990 was transferred in, but he wasn't able to pull any out. We couldn't charge him. That's not already envisioned in the actual loss figure? Correct. Because there's no money that was pulled out, so that's not actual loss. But we contend that that $990 needs to be captured somewhere. And so that's how we came up with the intended loss multiplier. We aggregated everything that was transferred in and everything that was pulled out. What was pulled out was less than what was transferred in, and that generates a multiplier above 1, in this case, 1.5. What's the story on the role of supervisory enhancement for Clark? For Mr. Clark, we certainly could have contended that he had his own drops, and for that reason alone he should get the enhancement. But because we're under 2S1.1, we needed to restrict our analysis to the wirings. The one person who wired, who we believed was subordinate to him, was Ms. Johnson. And we were able to show a disparity in roles because while we had plenty of Internet messages between Mr. Clark and the Egyptian defendants and Mr. Lucas, we had no such activity on the part of Ms. Johnson. All Ms. Johnson did was to relay on to Mr. Lucas drop account information for one of the drops, Ms. Settle and a number of other drops. For Ms. Settle, we also had a similar Internet message from Mr. Clark to Mr. Lucas, the same exact account. From the structure of the scheme, we argued to the district court that because of Mr. Clark's closer relationship to the scheme and his active participation with the Egyptians, it would stand to reason that whatever Ms. Johnson did in terms of the conspiracy was subordinate to Mr. Clark and at his direction. So what was the evidence that he was directing Johnson? It would be the connection between the two in terms of the drops. It would be the commonality in terms of Ms. Settle, the drop accounts information going over to Ms. Lucas. It would also be the fact that Ms. Johnson sent wires over to a common individual that Mr. Clark was also sending drop accounts over to. But I do want to stress this. Can I tell you my concern? Sure. My concern is that Judge Hatter might have found that Clark was supervising Ms. Johnson simply because of the nature of their relationship. Well, I think it's more than the boyfriend-girlfriend relationship. We tried to point out that there were activities taken on the part of both of them in relation to the same drop, in relation to the same recipient in Egypt, and I don't think this should be lost. Section 3B1.1 says not only do you look at activities between the two, but you look at the respective roles within the conspiracy. And for Mr. Clark, we had a plethora of evidence to show that Mr. Clark was directly involved with the Egyptians. What also concerns me is that the probation office did not recommend that Mr. Clark receive this enhancement for leader, organizer, manager, supervisor. Well, I can only point out that the probation office also did not recommend a number of the things that Mr. Lucas eventually got assessed for and that the district court assessed and that are not on appeal. The recommended loss for Mr. Lucas was much, much less than what we're contending with here. The district court disagreed with that, also disagreed on a number of the other enhancements, and, frankly, we believe that that's a province that the district court is entitled to. The district court is entitled to deference on a number of these factual kinds of determinations, and so, therefore, we believe that the findings that they made was appropriate. Let me ask you in terms of plain error, what was and what was not objected to in the district court? We contend that with regard to loss, the arguments that are made as to the failure to substantiate the intended multiplier calculations as well as the specific challenge to the chart regarding the so-called Las Vegas drops was not adequately preserved. The only statement that the defense made as to the intended loss multiplier was that this was not a representative sample. I think Was there an argument that it was double-counting? The double-counting argument was also not preserved by Mr. Clark at his sentencing. So all of this would be subject to plain error review. Now, the defense contains the defendant Lucas contains as to the representative sample that this captures the argument that he is now making. But we would suggest that representative sample, if anything, means your sample is too small. It's very nice that you have 175 transactions, but that's only one-twentieth of what went on. You need more. The argument, I kind of accept the defense's position that they did preserve an objection when they were talking about the sample wasn't representative. What they meant was that it wasn't reliable, sufficiently reliable for the judge to enhance, increase the loss value. Well, we, of course, take a different view. But even under that interpretation. Isn't that the point of that argument? I mean, was the sample representative? Well, 175 transactions we submitted is significantly greater than the much, much smaller samples that have been used for drug quality. It was 20 percent of the relevant accounts, right? Yes. That does not mean that it's representative. The 20 percent could be the highest or it could be the lowest. Well, I think just to go back to this one point, then I'd like to address why it is representative. I think what the defense was arguing in the context of the sentencing was the government needs more, not that this aspect is bad and has no relationship to the case. There was never any sort of argument made along those lines. It was simply your sample isn't big enough. And if we had the opportunity to make that argument, we could show that these were all linked to Mr. Lucas. We already had evidence in the record by virtue of the table submitted in connection with the guilty pleas. We already had evidence in terms of the sentencing that the court had already conducted because we submitted the bank records as well as the wires to Mr. Lucas. If all of it had to come back and we submit there's no reason for it, it would just be more of the same. But in terms of this being reliable, Mr. Lucas was in a unique position in this conspiracy. All of the transactions were linked directly to him. He admitted as much in his guilty plea colloquy when he accepted every one of the overt acts as being acts in execution of the conspiracy. He admitted knowing that these were all drops through whom the Egyptian fishers made the transfers. He admitted knowing, of course, that the money pulled out was proceeds of the fraud. And he admitted that he had interaction with all of these individuals, crew leaders, close associates, as well as the lowest level drops. And so we would submit that based upon the sample that we provided to the court, as well as the benefit of the court's experience in the other aspects of the case, which defendant acknowledged. Defendant acknowledged that sentencing at Excerpt of Record 36, that based upon his understanding of the other defendants that the court has seen, that they had a certain view of the case. So they were aware that there were other things going on beyond just Mr. Lucas's case alone. Based upon that large sample, we would submit that the court had more than an actual basis under Treadwell to arrive at a reasonable approximation of loss. What's the story with Judge Feist changing the sentence? Well, we don't believe – well, obviously the wording has changed, but we believe the actual amount of time did not. If I may direct the Court to the comments of Judge Feist, both at the beginning of sentencing and at the end. The Court initially stated that it was inclined to impose a sentence that would be half concurrent and half consecutive. That would be at page 985. Excuse me. That would be at page 985 of the excerpt, where Judge Feist states, in my view, and I'm reading it in the middle at line 11, I have some ideas about how I want to get where I want to get, but I think it's a case where a sentence of about half the time consecutive and half the time consecutive would be appropriate. The Court goes on and says under 5G1.3c, the case or the sentence would commence on July 1, 2016, which would mean that it would be partially concurrent and partially consecutive, and the parties can address that as well. After having heard from the parties, at the end of sentencing, when the Court pronounces its judgment, the Court says at line 1, so I am going to impose a sentence that commences. In fact, I think what I'm going to do is actually move the date back to ensure that there will not be a significant consecutive portion to 1-1-2016, but there will be some consecutive period as a result of that. What's the significance of this? We know that, but it turns out he screwed it up. I mean, he can't do what he did, and the question is can he fix it? He can. And based upon the case law, the Rule 36 case law including K, if the district court's oral pronouncement of sentence makes clear what he intended to do, the fact that the written judgment, while unambiguous in and of itself, if it conflicts with the oral pronouncement of sentence, then under Rule 36 the sentence can be corrected. But this judgment didn't conflict. This judgment recited exactly what Judge Fee said. It's not a matter of simply reciting it. It's also a matter of making clear that there is going to be some portion that is consecutive. And when the Bureau of Prisons comes back and says that sentence isn't consecutive at all. Wouldn't it have been better if Judge Fee had consulted with the Bureau of Prisons first? Absolutely. It would have been better if all of this were the case. However, what Judge Fee sought to do was to go by the guidelines. And the guidelines said pick a date. Unfortunately, the court, and frankly neither were the parties, in a position to calculate what does that actually mean in terms of good time credit and so on and so forth. And that's why the Bureau of Prisons came back. Yes, looking back, do I agree that the court should have said January 1, 2016, and what I mean by that is that it should be 24 months consecutive? Yes, we wouldn't be standing here. But having done that, we contend that the district court was entitled to make the correction that it did, particularly after the numerous rounds of briefing that we had, not only before the district court, but this Court as well. Okay. Under what law, what authority do you point to that the court could do this? We point to the rule, well, first of all, to Rule 36 and the K decision that we relied upon. We also rely in part on Jordan. And I know there's some discrepancy between the parties as to the significance of it. You're characterizing this as a clerical error, not a legal error. Correct. Correct. What the court was trying to do. You have to accept that this was a mere clerical error for you to prevail. That is correct. But under the case law, clerical error does comprehend this type of situation where the written judgment is in clear conflict with what the district court said it was going to do, which makes this case different from Werber, by the way. In Werber, the district court did not say, and I want to grant credit for federal custody from this period to this period. That's why the case turned out why it did. The Second Circuit certainly understood that the district court had inclinations in that direction, but what it rested its opinion on was the oral pronouncement doesn't say this. And so for that reason, we have to abide by the limitations that are provided  We relied both on Rule 36 and the rule of mandate. This court could not have just simply been saying, and we're going to send this case back and the district court can hear whatever it wants to hear and decide what it wants to decide. The mandate says is that the district court may entertain, which means it can entertain the motion, and if it's legally correct to change the sentence, it may. Can consider. And if it's not, it can't. And there are, frankly, there are a number of meanings to that. One is the court can decide whether or not there's jurisdiction or it could mean the court can decide this case on the merits. And we obviously advocate the latter because the briefing in this court directly addressed this issue. We made very clear to the court when the defense tried to dismiss its marijuana sentence appeal that we asked for language in the mandate that will allow the district court to do this. Granted, it was not the same language. By saying the district court may entertain the motion, we believe that the district court then had the power to decide. It could grant it on the merits. It could deny it on the merits. If this error cannot be corrected, how much of a windfall does the defendant get? Practical merits. Well, we believe that it is 24 months, but it could be somewhat less than that.  We believe that there are two alternative bases for the district court's action, which are from Garcia, from Verber, and the other cases cited by the defense. To sum up, we believe that both courts had copious amounts of material on which to base their judgment. For Mr. Lucas, after considering the record, the court imposed a departed sentence below the guideline range of 108 months on which was added the 24 months consecutive under 1028A. For Mr. Clark, it was a mid-range sentence. We would ask the court to affirm both sentences. Thank you, Mr. Chaik. Richard, are you going to do the rebuttal for everybody? No. I'm not going to take on Mr. Clark's problems. Okay. I'll take a couple minutes, and then I'll sit down. Just to go back again to the marijuana case, I think the most important point here is that the oral pronouncement of sentence is not everything the judge says up until the end of the hearing. The oral pronouncement is a specific moment that occurs in sentencing where the judge says, as the judge did in this case, it is the judgment of the court that, right? That's the beginning of the oral pronouncement of sentence. The fact that there were other preliminary statements or tentative statements would only come into play if there was silence or ambiguity. That's not what we have here. We have a very specific written judgment that matches the oral judgment, which is unambiguous, and for that reason, it should be the judgment. Let me ask you. Mr. Chang said that in the district court, the objection to the intended loss multiplier had to do with the reliability of the multiplier, not that there was a double counting that this was being captured twice. Is he right about that? So we have not made the double counting argument that Mr. Clark made. We have made arguments solely concerning the accuracy and whether the sample was representative. Okay. And that's the precise objection that the defense counsel made. He said, I don't think it's accurate. I don't think it's a representative sample. That captures both of the arguments. You don't have a double counting argument. We did not make a double counting argument as to the multiplier. Okay. I'm going to ask Ms. Sullivan about that in a minute. Okay. And those are the issues we're raising here. Only about one-fifth of the total accounts were there. The government in its briefings before the district court certainly didn't explain, as it did more thoroughly today, I think, why it selected the bank accounts it did. The selection includes these vaguest accounts that, for the best that I can tell, the only connection to this case is that they came from the same area code as another person Mr. Lucas was communicating with in Vegas. The government didn't put in the six volumes of records that it has attempted to put on here in appeal. For just that reason alone, the case should go back so that the defense has an opportunity to object. It had no reason to think that those other sentencings were in play, that the trial exhibits were all in play in his case. We have raised another loss issue. In addition to the double-counting issue, again, there's also a question about Mr. Lucas's role in the case and whether he should have been – whether all of the loss should have been attributed to him. We want to make sure we hear from Ms. Sullivan, too. I agree. I will sit down. Thank you. I'm sorry. I just have one more point. I apologize. The government said that Mr. Lucas essentially admitted culpability for all of these accounts. I just want to clarify that he admitted culpability for the overt acts. The very problem with a lot of these other accounts that they tried to use the multiplier on was that they weren't co-defendants who were charged. There were never any records of those people. So it's not true to say that all – that he accepted responsibility for all of them. Okay. Thanks. To answer the Court's question, the objection that was made by Mr. Clark's counsel was our objection to the four-level increase under the intended loss calculations and to the rule enhancement. So it wasn't the argument that was put forward that it was double counting, but the objection was made to that claim. That claim. That's pretty general. I mean, is it any more specific at all than that? The actual objection that was made, no. The counsel argued against the basis and also, frankly, argued against the basis of the 3.33 percent, the 30 percent. The government would rely on Mr. Lucas' post-arrest statement to their benefit but not to their detriment. There were times when he certainly was not truthful during all of his statements. There were times that he made somewhat grandiose claims, that he claimed that he made $40,000 in one day. There is nothing in the record to support that that first multiplier, the 3.33, was based on proceeds. And that's what the entire government's argument relies on is that, that it's not captured in the actual loss because it was based only on the proceeds that were taken out and not on the full amount of the transfer. And that's not even what his statement claims. His statement isn't clear as to whether or not it's the amount that's taken out or the full amount that's transferred. It would be logical that that 30 percent negotiated amount would be based on the amount that had been transferred as the negotiations are taking place prior to the transfer. In stating just on the addressing the rule issue for a moment, the government's arguments for why Mr. Clark was supervising Ms. Johnson, his girlfriend, was based mostly on having the same co-conspirator ties, that there were exchanges that were made with the same co-conspirators and they addressed the First Circuit case in support of the Monteiro case. In that case, there was an issue on whether or not control had been inferred from the overlap in the money transfer recipients, but the defendants in that case didn't challenge that they had supervised people. Their challenge was, or they contested, they had supervised people less than an amount of five people. And that was the challenge in that case. That issue wasn't raised. Thank you, Ms. Sullivan. Thank you. Ms. Murcha, Mr. Chen, thank you. The case just argued is submitted. We'll stand and recess.
judges: Cedarbaum, Silverman, Wardlaw